# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION-COVINGTON

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, EX REL. ATTORNEY GENERAL, RUSSELL COLEMAN, | Case No. |
| *Plaintiff,* | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| REALPAGE, INC., BH MANAGEMENT SERVICES, LLC, FIRST COMMUNITIES MANAGEMENT, INC., GREYSTAR REAL ESTATE PARTNERS, LLC, HIGHMARK RESIDENTIAL, LLC, INDEPENDENCE REALTY TRUST, INC., MID-AMERICA APARTMENTS, L.P., MID-AMERICA APARTMENT COMMUNITIES, INC., RPM LIVING, LLC, AND WILLOW BRIDGE PROPERTY COMPANY, LLC | |
| *Defendants.* | |

Plaintiff, Commonwealth of Kentucky ("Commonwealth" or "Kentucky"), by and through its Attorney General, Russell Coleman, brings this suit for violations of federal, state, and common law, and seeks damages, injunctive and equitable relief, and civil penalties against the Defendants RealPage, Inc. ("RealPage"), BH Management Services, LLC ("BH"), First Communities Management, Inc. ("First Communities"), Greystar Real Estate Partners, LLC ("Greystar"), Highmark Residential, LLC ("Highmark"), Independence Realty Trust, Inc. ("IRT"), Mid-America Apartments, L.P. and Mid-America Apartment Communities, Inc. (together, "MAA"), RPM Living, LLC ("RPM"), and Willow Bridge Property Company, LLC ("Willow Bridge"):

## I.    INTRODUCTION

1.      Renters are entitled to the benefits of vigorous competition among landlords. In prosperous times, that competition should limit rent hikes; in harder times, competition should bring down rent, making housing more affordable. RealPage has built a business out of frustrating the natural forces of competition. In RealPage's own words, "a rising tide raises all ships."[1] This is more than a marketing mantra. RealPage sells software to landlords that collects nonpublic information from competing landlords and uses that combined information to make pricing recommendations. RealPage says it "helps curb [landlords'] instincts to respond to down-market conditions by either dramatically lowering price or by holding price when they are losing velocity and/or occupancy. Our tool [] ensures that [landlords] are driving every possible opportunity to increase price even in the most downward trending or unexpected conditions."

2.      In fact, as RealPage's Vice President of Revenue Management Advisory Services described, "there is greater good in everybody succeeding versus essentially trying to compete against one another in a way that actually keeps the entire industry down." As he put it, if enough landlords used RealPage's software, they would "likely move in unison versus against each other." To RealPage, the "greater good" is served by ensuring that otherwise competing landlords rob Americans of the fruits of competition—lower rental prices, better leasing terms, more concessions.

3.      RealPage replaces competition with coordination. It does so openly and directly, and renters in Kentucky are left paying the price.

---

[1] Quotes in this Complaint attributed to RealPage or its employees appeared in the Amended Complaint (Dkt. No. 47) filed in *United States of America et al. v. RealPage, Inc.*,  No. 1:24-cv-00710 (M.D.N.C.).

4.     Kentucky has robust rental markets. Approximately 560,000 Kentucky households are occupied by renters—a majority of these renters live in multifamily housing. In 2022, Kentucky saw the third largest increase in multifamily home construction across the United States. Accordingly, the number of renters in the Commonwealth is likely to continue to grow.

5.     At the same time, rents in Kentucky have significantly increased. For instance, rent growth in Louisville was second highest amongst all U.S. markets in 2023. As of 2023, *47.5% of Kentucky renters are cost-burdened*—meaning Kentucky renters consume at least 30% of their income on rent—up from 43.3% in 2019.

6.     A family's selection of an apartment reflects a complex set of values and criteria including comfort, safety, access to schools, convenience, and critically, affordability. To ensure they secure the greatest value for their needs, renters rely on robust and fierce competition between landlords.

7.     RealPage distorts that competition. In Kentucky, as it does across the United States, RealPage sells landlords commercial revenue management software: RealPage's Revenue Management Solutions. RealPage's Revenue Management Solutions include various software programs, including Lease Rent Options ("LRO"), YieldStar, and AI Revenue Management ("AIRM"). These programs will be referred to collectively herein as "Revenue Management Solutions" or "RMS."

8.     RealPage develops, markets, and sells its Revenue Management Solutions to enable landlords to sidestep vigorous competition to win renters' business. As used in this Complaint, the term "landlord" refers to a variety of entities that are responsible for setting rents

3

and other lease terms at multifamily properties, including owners, operators, and managers of multifamily housing facilities.

9.     Many of the largest landlords in Kentucky, including BH, First Communities, Greystar, Highmark, IRT, MAA, RPM, and Willow Bridge (collectively, the "Defendant Landlords"), who would otherwise be competing with each other, submit or have submitted, on a daily basis, their competitively sensitive information to RealPage. This nonpublic, material, and granular rental data includes, among other information, a landlord's rental prices from executed leases, lease terms, and future occupancy.

10.     RealPage collects a broad swath of such data from competing landlords, combines it, and feeds it into an algorithm.

11.     Based on this process and algorithm, RealPage provides daily, near real-time pricing "recommendations" back to competing landlords. These recommendations are based on the non-public, business sensitive information of their rivals. But these are more than just "recommendations." Because, in its own words, a "rising tide raises all ships," RealPage monitors compliance by landlords with its recommendations. RealPage also reviews and weighs in on landlords' other policies, including by trying to—and often succeeding in—ending renter-friendly concessions (like a free month's rent or waived fees) to attract or retain renters. A significant number of landlords have effectively agreed to outsource their pricing function to RealPage by turning on automatic acceptance of RealPage's pricing suggestions (or other settings) such that RealPage, as a middleman, and not the free market, determines the price that a renter will pay. Competing landlords choose to share their information with RealPage to "eliminate the guessing game" about what their competitors are doing and ultimately take

4

instructions from RealPage on how to make business decisions to "optimize"—or in reality, maximize—rents.

12.    RealPage's stated goals and value proposition are not a secret. Its executives are blunt: They want landlords to "avoid the race to the bottom in down markets." Sometimes RealPage is even more direct, acknowledging that its software is aimed at "driving every possible opportunity to increase price" or observing that among landlords, "there is a greater good in everybody succeeding versus essentially trying to compete against one another in a way that actually keeps the entire industry down."

13.    That is not how the free market works. A free market requires that landlords compete on the merits, not coordinate pricing. Landlords should win renters by offering whatever combination of price and quality they think is most attractive. For example, landlords could lower rents or provide other financial concessions, like free months of rent, or invest in amenities like gyms, grilling areas, or pools. Put differently, the fear of losing a renter to a competitor should motivate rival landlords to compete vigorously.

14.    RealPage's revenue management software ingests, on a daily basis, nonpublic rental rates, future apartment availability, and changes in competitors' rates and occupancy. As competitor-landlords increase their rents, RealPage's software nudges other competing landlords to increase their rents as well. RealPage calls this "maximiz[ing] opportunity[.]"

15.    In sum, RealPage is an algorithmic intermediary that collects, combines, and exploits landlords' competitively sensitive information. And in so doing, it enriches itself and compliant landlords, including the Defendant Landlords, at the expense of renters who pay inflated prices and honest businesses that would otherwise compete.

16.     From at least January 2016 through the present (the "Conspiracy Period"), Defendants engaged in a conspiracy to fix and inflate the price of multifamily rental housing in Kentucky. The Commonwealth brings this complaint to prevent RealPage and the Defendant Landlords from continuing to engage or attempting to engage in the anticompetitive conduct described herein.

17.     This action is filed by Attorney General Russell Coleman under provisions of the Sherman Act, the Clayton Act, and the Kentucky Consumer Protection Act as *parens patriae* on behalf of the citizens, general welfare, and economy of the Commonwealth of Kentucky. For the injuries that Plaintiff has sustained and continues to sustain a result of RealPage and the Defendant Landlords' anticompetitive misconduct, the Commonwealth seeks damages, restitution, disgorgement, civil penalties, other monetary relief, injunctive and other equitable relief under federal and state antitrust, consumer protection, unfair trade practices, and unjust enrichment laws, as well as costs of suit, including reasonable attorneys' fees.

## II.    JURISDICTION AND VENUE

18.     **Subject Matter Jurisdiction:** This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Additionally, the Court has subject matter jurisdiction under 15 U.S.C. § 15c, as the claims enumerated herein arise from the *parens patriae* authority of the Attorney General to act on behalf of Kentucky and its citizens.

19.     **Supplemental Jurisdiction**. In addition to violations of federal antitrust laws, Kentucky also alleges violations of state statutory and common law. All claims under federal and state law are based upon a common nucleus of operative fact and the entire action, therefore,

should be commenced in a single case to be tried as one judicial proceeding. This Court, therefore, has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). Exercising jurisdiction over the state law claims will avoid unnecessary duplication of actions and support the interests of judicial economy, convenience to the litigants, and fairness.

20.    **Personal Jurisdiction**: The Court has personal jurisdiction over Defendants as they have purposefully availed themselves of this forum by conducting business in Kentucky and by causing harm as a direct and proximate result of their actions. Defendants regularly transacted or solicited business in Kentucky; derived substantial revenue from services rendered in Kentucky; or contracted to supply or advertise goods or services in Kentucky. Defendants have the requisite minimum contacts with Kentucky necessary to permit this Court to exercise jurisdiction.

21.    **Venue:** Venue in this District is proper under 15 U.S.C. § 22, as Defendants transact business or have registered agents in this District. Venue is also proper in this District because Defendants' conduct, as alleged herein, caused harm to Kentucky citizens who live in this District.

22.    **Interstate Commerce**. Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, restricting output, and harming renters throughout the United States.

23.    **Divisional Assignment.** Assignment of this Action to the Northern Division is appropriate under L.R. 3.2 (a)(3)(A).

### III.  PARTIES

24.     Plaintiff, the Commonwealth of Kentucky *ex rel*. Russell Coleman, Attorney General is responsible for the enforcement and administration of Kentucky law, including but not limited to the Kentucky Consumer Protection Act, KRS § 367.110 *et seq*. (hereinafter "KCPA"). The Attorney General is authorized to bring this suit under KRS § 367.190 and KRS § 367.990, as well as 15 U.S.C. § 15c, which permits states' attorney generals to bring *parens patriae* suits on behalf of those injured in violation of the Sherman Act. He brings this action in the name of the Commonwealth of Kentucky and has determined it to be in the public interest to do so.

25.     Defendant RealPage, Inc. is a corporation headquartered in Richardson, Texas, organized and existing under the laws of Delaware. RealPage provides software and services to managers of residential rental apartments, including the Defendant Landlords. RealPage was a public company from 2010 until December 2020, when it was purchased by Chicago-based private equity firm Thoma Bravo, LP, in a transaction that valued RealPage at approximately $10.2 billion.

26.     Defendant BH Management Services, LLC ("BH"), is a limited liability company headquartered in Des Moines, Iowa, organized and existing under the laws of Iowa. BH operates in Kentucky, including in the Louisville and Great Cincinnati Markets. During the Conspiracy Period, BH entered a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 107,000 apartments nationally, including, upon information and belief, properties in Kentucky.

27.     Defendant First Communities Management, Inc., is a corporation headquartered in Atlanta, Georgia, organized and existing under the laws of the State of Georgia. First

8

Communities operates in Kentucky, including in the Louisville Market. During the Conspiracy Period, Defendant First Communities entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its multifamily rental units throughout the United States, including, upon information and belief, properties in Kentucky. In early 2024, Asset Living LLC, one of the nation's largest third-party property management firms, announced it had acquired First Communities.

28.    Defendant Greystar Management Services, LLC is a limited liability company headquartered in Charleston, South Carolina, organized and existing under the laws of Delaware. Greystar is the largest manager of residential rental apartments in the United States. Greystar operates in Kentucky, including in the Louisville, Lexington, and Great Cincinnati Markets. During the Conspiracy Period, Greystar entered into a written contract, paid for, and used at least three RealPage RMS—YieldStar, LRO, and AIRM—to manage some or all of its more than 700,000 multifamily rental units throughout the United States, including, upon information and belief, properties in Kentucky.

29.    Defendant Highmark Residential, LLC is a limited liability company headquartered in Dallas, Texas, organized and existing under the laws of Delaware. Highmark operates in Kentucky, including in the Louisville and Lexington Markets. During the Conspiracy Period, Highmark entered into a written contract, paid for, and used at least one RealPage RMS—YieldStar—to manage some or all of its more than 79,000 multifamily rental units nationwide, including, upon information and belief, properties in Kentucky.

30.    Defendant Independence Realty Trust, Inc. is a real estate investment trust headquartered in Philadelphia, Pennsylvania, organized and existing under the laws of Maryland.

IRT operates in Kentucky, including in the Louisville and Lexington markets. During the Conspiracy Period, IRT entered into a written contract, paid for, and used at least two RealPage RMS—YieldStar and LRO—to manage some or all of its more than 36,000 multifamily rental units, including, upon information and belief, properties in Kentucky.

31.    Defendant Mid-America Apartments, L.P., a limited partnership headquartered in Germantown, Tennessee, organized and existing under the laws of Tennessee, is a wholly owned subsidiary of Defendant Mid-America Apartment Communities, Inc., a corporation headquartered in Germantown, Tennessee, organized and existing under the laws of Tennessee. MAA operates in Kentucky, including in the Louisville and Lexington markets. During the Conspiracy Period, MAA entered into a written contract, paid for, and used at least one RealPage RMS—LRO—to manage some or all of its more than 103,000 multifamily rental units, including, upon information and belief, properties in Kentucky.

32.    Defendant RPM Living, LLC is a limited liability company headquartered in Austin, Texas, organized and existing under the laws of Texas. RPM operates in Kentucky, including in the Louisville market. During the Conspiracy Period, RPM entered into a written contract, paid for, and used at least three RealPage RMS—YieldStar, LRO, and AIRM—to manage some or all of its more than 226,000 multifamily rental units nationwide, including, upon information and belief, properties in Kentucky.

33.    Defendant Willow Bridge Property Company, LLC is a privately-owned company organized under the laws of the State of Texas and is headquartered in Dallas, Texas. Willow Bridge operates in Kentucky, including in the Louisville market. During the Conspiracy Period, Willow Bridge entered into a written contract, paid for, and used at least one RealPage RMS—

10

AIRM—to manage some or all of its more than 180,000 multifamily rental units nationwide, including, upon information and belief, properties in Kentucky.

34.     Various other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the illegal conduct described herein. Defendants are jointly and severally liable for the acts of these unnamed co-conspirators.

35.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

36.     Defendants are also liable for acts done in furtherance of the alleged conduct by companies they acquired through mergers and acquisitions.

## IV.   FACTUAL ALLEGATIONS

### A. Kentucky Multifamily Housing Markets

37.     Approximately 560,000 Kentucky households are renters. A great majority of these renters live in multifamily housing.

38.     Multifamily housing has experienced significant recent growth in Kentucky. In 2022, Kentucky saw the third largest increase in multifamily home construction in the United States. Multifamily units authorized in Kentucky increased by 97.7%—a total addition of 2,349 units—between 2020 and 2021.

39.     Three of the largest multifamily housing submarkets in Kentucky are Greater Cincinnati, Louisville, and Lexington-Fayette.

### 1. *The Greater Cincinnati Market*

40.     The Greater Cincinnati Market includes the Kentucky counties of Boone, Kenton, Campbell, Pendleton, Grant, Bracken, Gallatin, and Mason. In 2022, it was the 43rd largest multifamily market in the United States with nearly 120,000 completed units and another 25,000 in development. At the start of 2024, the Greater Cincinnati market was the eighth most popular rental market in the United States. According to the 2023 American Community Survey ("ACS"), over 260,000 residents in the Greater Cincinnati Market lived in multifamily housing.

41.     Through its suite of business products, including RMS, RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Greater Cincinnati Market, as self-reported by RealPage on its website:



**Figure 1.**

42.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years. Greater Cincinnati renters are paying 34% more in rent in 2023 than they paid in 2016.

### 2. *The Louisville Market*

43.    The Louisville Market is also a significant multifamily home market. As of September 2022, Louisville was the 52nd largest multifamily market in the United States, with

85,570 completed units and 22,800 units in development. According to the 2023 ACS, over 134,000 residents in the Louisville-MSA live in multifamily housing.

44.    Through its suite of business products, including RMS, RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Louisville Market, as self-reported by RealPage on its website:



**Figure 2.**

45.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years. Rents for multifamily units in the Louisville Market have experienced significant year-over-year increases since 2020 and outpaced the wider southern region in 2023.

14



**Figure 3.**

46.    Rent growth in Louisville was second highest amongst all U.S. markets in 2023 and spiked upward while rent growth was decelerating across the country.



**Figure 4.**

### 3. *The Lexington-Fayette Market*

47.    The Lexington-Fayette Market is another significant multifamily housing market in Kentucky. As of September 2022, it was the 85th largest multifamily market in the United States, with 40,057 completed units and 6,425 units in development.

48.     Through its suite of business products, including RMS, RealPage collects and shares pricing and occupancy information for a high concentration of multifamily residential apartment units within the Lexington-Fayette Market, as self-reported by RealPage on its website:



**Figure 4.**

49.    Widespread adoption of Defendant RealPage's RMS has caused rent to increase explosively in recent years. Rents for multifamily units in the Lexington-Fayette Market have experienced significant year-over-year increases since 2020 and outpaced the wider southern region in 2023.



**Figure 5.**

### B. RealPage's Revenue Management Solutions are Fueled by Non-Public, Competitively Sensitive Information Shared by Landlords

50.    RealPage dominates the market for commercial revenue management software that landlords use to price apartments, controlling at least 80 percent of that market, according to its own estimates. RealPage currently offers various revenue management systems to landlords, including YieldStar, AIRM, and LRO.

51.    The company's main legacy software, YieldStar, is the product of three acquisitions and subsequent internal development. Its successor, AIRM, uses much of the same

codebase as YieldStar, but RealPage claims that AIRM's refined models and forecasting are more precise. RealPage acquired its other revenue management software, LRO, in 2017.

52.    Competitively sensitive data collected from competing landlords is a critical input to RealPage's revenue management software. AIRM and YieldStar collect this data, such as rental applications, executed new leases, renewal offers and acceptances, and forward-looking occupancy, and use it to generate price recommendations for the competing landlords. This information is among the most competitively sensitive data a landlord maintains.

53.    The exploitation of sensitive data from competing landlords is central to RealPage's approach. As part of pitching its software to landlords, RealPage highlights that its pricing algorithms use their competitors' data sourced directly from "lease transaction data." RealPage describes this nonpublic data from competitors as one of three "building blocks of price" in AIRM and YieldStar. Landlords thus share their competitively sensitive information with RealPage with the understanding that RealPage's software will use the data to generate recommendations for rivals (and vice versa).

### 1. Landlords Agree to Share Nonpublic, Competitively Sensitive Transactional Data with RealPage for Use in Generating Competitors' Pricing Recommendations

54.    RealPage amasses nonpublic, competitively sensitive data from competing landlords through use of its pricing algorithms, other rental property software, and thousands of monthly phone calls. The combined troves of nonpublic, competitively sensitive data are much more granular, sensitive, timely, and comprehensive than alternatives—and far more detailed than any data publicly available to potential renters. RealPage then uses this data in generating competitors' pricing recommendations.

55.     ***Data shared through YieldStar and AIRM***. Each AIRM and YieldStar client agrees to share detailed data with RealPage that are private, updated nightly, and granular. The data includes lease-level information on each unit's effective rent (rent net of discounts), rent discounts, rent term, and lease status, as well as unit characteristics such as layout and amenities. It also includes the number of potential future renters who have visited a property or submitted a rental application.

56.     Landlords understand that AIRM and YieldStar use their data to recommend prices not just for their own units, but also for competitors. For example, a revenue management director at Greystar testified that she understood that Greystar, and other competing landlords who used AIRM or YieldStar, agreed with RealPage to share their data, which was combined in a single data pool for use by YieldStar and AIRM. An executive at Willow Bridge noted the advantages to using YieldStar at a property if others in the property's submarket—the small geographic area around the property—also used YieldStar because "the shared data between the models at different communities can be a benefit in getting accurate transactional data on a timely basis."

57.     Landlords agree to provide this information for use by their competitors because they understand they will be able to leverage the sensitive information of their rivals in turn. In its pitch to prospective clients, RealPage describes AIRM's and YieldStar's access to competitors' granular, transactional data as a meaningful tool that it claims enables landlords to outperform their properties' competitors by 2–7%. RealPage clients receive training that highlights the role of competitors' transactional data in the price recommendation process.

20

58. ***Data Shared Through Other RealPage Products.*** AIRM and YieldStar are not the only ways that RealPage shares nonpublic, competitively sensitive information among landlords. RealPage obtains the same confidential transactional data from landlords that license at least three other programs: OneSite, Performance Analytics with Benchmarking, and Business Intelligence.

59. OneSite is RealPage's property management software, which operates as the central source of data for landlords' leasing activity. Performance Analytics with Benchmarking allows landlords to compare the performance of their properties and floor plans (e.g., a one-bedroom, one-bathroom unit) to their competitors. Business Intelligence is a data analytics tool that pulls data from a landlord's property management software and other products.

60. Each landlord using RealPage's OneSite, Business Intelligence, and Performance Analytics with Benchmarking products agrees to share its proprietary data with RealPage and agrees that RealPage's revenue management software can use the data to generate pricing recommendations. The license agreements for these products specifically identify the shared data, such as pricing information, as confidential, nonpublic information. RealPage takes this deeply confidential information and uses it to provide rent recommendations to competitors of these clients.

61. These agreements grant RealPage access to confidential information from over 16 million units across the country, including many that do not use its revenue management products. With respect to Performance Analytics with Benchmarking alone, a RealPage sales representative told a prospective client that "we have over 16 million units of data coming from various source operating systems (PMS) [property management software] into the PAB

21

platform," making RealPage the top choice for "transactional data benchmarking." With properties containing approximately 3 million units using AIRM and YieldStar, these additional agreements meaningfully multiply the scale of the transactional data used by AIRM and YieldStar. This gives RealPage greater visibility, including into markets with less penetration by AIRM and YieldStar, granting even initial AIRM and YieldStar adopters in a new market the benefit of access to a significant amount of nonpublic, competitively sensitive information.

62.     Landlords understand that AIRM and YieldStar will use data from these products. A revenue management director at Greystar explained that RealPage ingests transactional data from several RealPage products, besides AIRM and YieldStar, for use in revenue management. A property owner requested information from Greystar on which competing properties used revenue management software. In an internal response, the Greystar director noted that RealPage has "access to more transactional history than anyone and [is] pulling data from anyone using RealPage products which includes companies who manually price or use other revenue management firms but leveraging their BI [Business Intelligence] products."

63.     A revenue management executive at Willow Bridge asked RealPage if other specific landlords were using RealPage's non-revenue management products. The landlord's owner client was concerned about the data available to YieldStar because competing properties were unsophisticated and did not use revenue management. This executive wanted to confirm that "YieldStar will be able to leverage actual transactional data behind the scenes and not just look at offered rents for their comps." RealPage reminded the Willow Bridge executive that RealPage collected transactional data for all users of OneSite, Business Intelligence, and

Performance Analytics with Benchmarking, and reassured the executive that YieldStar had ample transactional and survey data for that area.

64. ***Calling Landlords.*** RealPage has an additional, complementary product called Market Analytics. Market Analytics compiles data from over 50,000 monthly phone calls that RealPage makes to landlords across the country. On these calls RealPage collects nonpublic, competitively sensitive information by floor plan on occupancy rates, effective rents, and concessions, as well as information on the owner, management company, and any revenue management software used at the property. These market surveys cover over 11 million units and approximately 52,000 properties. Landlords, including but not limited to those that use AIRM, YieldStar, or other RealPage products, knowingly share this nonpublic information with RealPage.

### 2. *AIRM and YieldStar Users Agree with RealPage to Use the Software to Align Pricing*

65. In addition to agreeing to share nonpublic, competitively sensitive data with RealPage, each AIRM and YieldStar licensee agrees with RealPage to use the AIRM or YieldStar pricing software as RealPage designed it. Landlords are expected to review daily AIRM or YieldStar floor plan price recommendations and use the programs to set scheduled floor plan rents or even unit-level prices.

66. While landlords may not accept every price recommendation, they use AIRM or YieldStar as their pricing software, regularly review AIRM or YieldStar floor plan recommendations, use AIRM or YieldStar to set a scheduled floor plan rent, and use AIRM or YieldStar to set unit-level prices.

67.     Landlords who use AIRM and YieldStar know that others are using the same software. Some landlords track which revenue management software their competitors use, including by contacting competing properties directly and exchanging nonpublic information. Other landlords, including prospective AIRM and YieldStar users, ask RealPage whether there are existing AIRM and YieldStar users nearby before they themselves license the products.

68.     An executive at Willow Bridge, for example, explained to her team how she would learn from RealPage data or from a property's website whether a property used revenue management. This information is important because properties that use revenue management tend to update prices much more frequently, and so a landlord will react differently to those price changes if it knows the competitor is using revenue management.

69.     RealPage frequently tells prospective and current clients that a "rising tide raises all ships." A RealPage revenue management vice president explained that this phrase means that "there is greater good in everybody succeeding versus essentially trying to compete against one another in a way that actually keeps the industry down." This rising tide lifts all landlords, including but not limited to AIRM and YieldStar users.

70.     In using AIRM and YieldStar, landlords expect this pricing alignment and use RealPage software in part for this reason.

### 3. RealPage's Transactional Data is Fundamentally Different from Other Data Available to Landlords

71.     The data that RealPage uses and supplies is unique relative to public data available to landlords on listing or property websites. As compared to public data, RealPage data

is much more granular, covers a broader array of business information, and includes competitively sensitive data across several dimensions. For example:

    a.   *Information on Actual Transactions.* RealPage's data include, for each lease, the unit, floor plan, listed rent, final transacted lease price (including any discounts), and lease term.

    b.   *Renewals.* RealPage's data include the same information for lease renewals. Information on renewals is not listed publicly—not even asking rents—leaving a significant blind spot for landlords not using RealPage.

    c.   *Time Span.* AIRM and YieldStar have access to current and historical lease data, from the previous day and going back two to three years.

    d.   *Future Demand.* The shared data further includes information on tenant demand, including detailed information on inquiries and applications by potential future tenants.

    e.   *Accuracy.* Landlords have greater assurance of the accuracy of the data because it comes directly from the landlords' own databases.

    f.   *Coverage.* The RealPage data covers millions of units from users of its revenue management software and other products.

72.    RealPage touts how its data is different. As one RealPage pitch deck put it, "we have [the] most data and the best data." And the "[q]uality of data is best in class given that it is 'lease transaction data'—this provides insight into performance data from actual signed leases, both new and renewal, net effective of concessions." Another noted that without YieldStar "you'll be pricing your renewals in the dark without insight into actual lease transaction data that

25

YS uses to help you make pricing decisions. This is critical to price renewals right[,] especially in a downturn."

### 4. RealPage Revenue Management Software Uses Nonpublic, Competitively Sensitive Data to Recommend Prices

73.    AIRM and YieldStar are built upon similar code and leverage competitive data in similar ways. LRO, on the other hand, was originally developed outside of RealPage and takes a different approach.

74.    AIRM uses competitors' nonpublic, transactional data in three separate stages of the pricing process: (1) model training, (2) floor plan price recommendations, and (3) unit-level prices. YieldStar uses competitors' nonpublic, transactional data in stages two and three of its process.

### 5. AIRM Model Training Relies on Competitively Sensitive Data to Generate Learned Parameters.

75.    In the first stage, RealPage trains its AIRM models using nonpublic data from OneSite and other property management software, totaling millions of executed lease transactions, new lead applications, renewal applications, and guest cards filled out by visiting potential tenants. This data is run through a machine learning model to generate learned parameters for supply and demand models that are then used for all AIRM clients across the country. Like the coefficients in a regression model, the learned parameters are applied to the data of a landlord's specific property, and to the data of its competitors, when AIRM makes pricing recommendations. RealPage generally retrains the models three to four times per year using updated nonpublic data.

26

### 6. AIRM and YieldStar Incorporate Competitors' Nonpublic Data to Generate Floor Plan Price Recommendations.

76.     In the second stage, AIRM or YieldStar provides a price recommendation for every floor plan of a given property. A floor plan is a grouping of units that share similar characteristics, such as the number of bedrooms and bathrooms and square footage. Landlords define the floor plans in their buildings—for example, a large apartment building might have separate sets of floor plans for studios, one-bedroom, and two-bedroom apartments. As discussed below, AIRM and YieldStar use competitors' nonpublic, transactional data in nearly every step of setting a recommended floor plan price, including identifying peer properties, forecasting occupancy and leasing, increasing rents to match competitors' changes, and determining the magnitude of price changes.

77.     **Identifying Peers.** First, AIRM and YieldStar use confidential transaction data to identify a property's peer properties, which includes those of close competitors. In selecting peer properties, RealPage's algorithm generally looks for properties with similar floor plans, within close geographic proximity, and with similar effective rents over time. AIRM or YieldStar clients may review the list of peer properties and request that RealPage add or remove specific properties.

78.     AIRM or YieldStar then uses the nonpublic data from competitors' executed leases to generate a market range chart for each floor plan. This chart identifies a "smoothed" market minimum effective rent and market maximum effective rent. The market minimum is a hard floor. AIRM and YieldStar will not recommend a rent below the market minimum. On the

27

other hand, the market maximum is a "soft ceiling," and the programs will recommend prices above the ceiling.

79.     The client has access to the market range chart within the AIRM and YieldStar interfaces. As shown below, for each floor plan the client can see the smoothed market minimum and market maximum and where the client's own floor plan sits within the market range.

80.     ***Forecasting Occupancy and Leasing.*** Every night, for each participating property, AIRM applies the model's learned parameters to that property's internal transactional data to forecast the number of expected vacancies and expected lease applications for a certain period into the future. AIRM may also use competitors' data to adjust the projected supply.

81.     AIRM or YieldStar then determines whether actual leasing for a floor plan is on track to meet predicted leasing. To do so, it creates a forecast of the number of leases over time, using nonpublic lease and application data from the subject property, and potentially from so-called surrogate properties (similar properties in the surrounding area). When there is an imbalance between a property's actual and forecasted leasing, it recommends a price change.

82.     ***Changing Rents to Match Competitors.*** Even when a property's supply and demand are balanced, RealPage's software will still recommend a price change, based on competitors' nonpublic data, when it determines that the market is moving. For example, if the minimum and maximum of the competing floor plans' effective rents increase, it will recommend a price increase to maintain the floor plan's market position (its price position relative to its competitors).

83.     ***Determining Magnitude of Price Changes.*** Once AIRM or YieldStar has determined that it will recommend a price increase or a price decrease, it again uses competitors'

transactional data to determine *how much* the price should move and provide a floor plan price recommendation. It uses nonpublic transactional data from peer properties, in addition to data from the subject property and surrogate properties, to generate a market response curve—analogous to a market demand curve—for every floor plan. This demand curve provides an estimate of how demand for particular apartments would change in response to changes in rents, a measure that RealPage calls elasticity. In other words, it uses competitors' nonpublic transactional data to calculate how many leases the property will likely gain or lose for a particular floor plan, for every price point along the curve. Using this data, AIRM or YieldStar can determine how much the price can increase and still achieve the target number of leases, or by how little price can decrease to maintain a target occupancy.

84.     RealPage describes elasticity as a pivotal input into balancing supply and demand and, therefore, price.

85.     The use of surrogate properties in this pricing process has the potential to push convergence on price even further. As two properties' surrogate sets become closer—and therefore their respective demand curves become more similar—AIRM and YieldStar will generate increasingly similar prices for the two properties. And the use of surrogates is common. One of the largest landlords in the country, for example, uses surrogates at over 80% of its properties.

86.     This process repeats for every floor plan in the client's property, every night. A new floor plan price recommendation is generated daily.

29

### 7. AIRM and YieldStar Use Competitors' Nonpublic Data— Including Data on Future Occupancy—to Determine Unit-level Prices.

87.     A property manager at the landlord reviews each floor plan recommendation daily and enters the floor plan price. AIRM and YieldStar then use the floor plan price to generate prices for every unit within the floor plan. The unit price is shown in a pricing matrix, which provides the price for each combination of start date and lease term. To generate the price for an individual unit, the floor plan price is adjusted to account for unit-specific factors such as amenities (e.g., a desirable view, the floor level, or an in-unit washer and dryer), staleness (i.e., how long that specific unit has been vacant), and the timing of lease expirations. AIRM and YieldStar again use competitors' nonpublic data during this step in at least two ways.

88.     *First*, AIRM and YieldStar use data on competitors' supply of multifamily housing to adjust recommendations to limit "exposure" with a feature called lease expiration management. Exposure refers to the number of units that are available for lease. Managing lease expirations is an important element of revenue management software. If too many leases expire and the corresponding units become available at the same time, supply increases and rents for those units will tend to drop. This process will also tend to repeat itself as the same units will become available at the same time a year later for leases with a standard twelve-month term.

89.     The objective of expiration management is to smooth out this exposure so that landlords, as explained by one RealPage employee, "remain in a position of pricing power." For example, if AIRM or YieldStar sees that a large number of units will likely be available in twelve months, it will increase the price recommendation for a twelve-month lease relative to price recommendations for leases of other terms, such as 11 months or 13 months, in order to

nudge potential renters to accept those terms. Expiration management can only raise prices—AIRM does not lower a unit's price if the lease term would fall in an underexposed period.

90.     This calculation does not rely *only* on the predicted future supply for the client's property. For any landlord who uses a "market seasonality" setting, AIRM and YieldStar *also* rely on competitors' transactional data and the supply for those competitors—including the supply of competitors' existing leases that expire in the future. AIRM and YieldStar thus work to manage lease expirations for the client's units based on how competitors' supply will change. RealPage strongly recommends to landlords that they use market seasonality.

91.     The use of competitors' nonpublic data in expiration management to fill out the pricing matrix occurs regardless of whether the landlord accepts the AIRM or YieldStar recommendation. Thus, even if a landlord were to override every price recommendation, its rental prices would still be influenced by nonpublic information about its competitors' supply.

92.     **Second**, AIRM and YieldStar include an amenity optimization feature. By pricing specific amenities within units, landlords can avoid making wholesale pricing changes to a floor plan if a specific unit fails to lease. Within the amenity analysis, AIRM and YieldStar provide market values for specific amenities to landlords, allowing them to compare their perceived value of an amenity with the nonpublic valuation of their competitors. The peer data include the market minimum and maximum value for specific amenities.

### 8.    *LRO Relies Primarily on Landlords to Input Data on Competitors*

93.     RealPage's LRO also provides pricing recommendations to users. Each week, LRO users manually input competitor information into the system that they have obtained from

31

public websites or more questionable means, such as communicating directly with their competitors.

94.     Some LRO users subscribe to a feature called AutoComp. With this feature, RealPage provides information on competitors' rents, traffic, and occupancy. This information comes from market surveys that RealPage compiles using call centers to call competitor properties. Landlords may use LRO without using AutoComp.

### 9.   *RealPage Uses Multiple Mechanisms to Increase Compliance with Price Recommendations*

95.     AIRM and YieldStar provide daily price recommendations. RealPage has taken multiple steps to increase compliance with AIRM and YieldStar price recommendations. It designed AIRM and YieldStar to make it much easier to accept recommendations than to decline them. It built an auto-accept function and pushes clients to adopt it and increase its role. And its pricing advisors encourage landlords to follow AIRM and YieldStar pricing recommendations. Among their duties, pricing advisors review any request to override a price recommendation.

### 10.   *AIRM and YieldStar Make it Easy to Accept Recommendations and More Difficult and Time-Consuming to Decline*

96.     Every morning, the landlord's property manager chooses whether to accept the floor plan price recommendation, keep the previous day's rent, or override the recommendation. These options are the same for new leases and renewal leases. RealPage makes it easier and faster for a client to accept a recommendation than to decline it. When accepting recommendations, the manager can choose to do a bulk acceptance—she can accept all or multiple floor plan recommendations at once. But she cannot do the same when overriding, or rejecting, the recommendation.

32

97.     Instead, for every recommendation that she does not accept—whether overriding or keeping the previous day's rent—the property manager must provide "specific business commentary" for diverging from the recommendation. This justification, RealPage instructs, should not be a mere preference for another price but must be based on a factor that the model cannot account for, such as local construction or renovations occurring in the building. It must be a "strong sound business minded approach."

98.     The property manager knows that these recommendation rejections and accompanying justifications will be sent to a RealPage pricing advisor. If the pricing advisor disagrees with the rejection or justification, the disagreement is escalated for resolution to a landlord's regional manager, who typically supervises the property manager.

99.     AIRM and YieldStar each include auto-accept functions. This functionality automatically accepts price recommendations falling within certain parameters. By default, AIRM and YieldStar set auto-accept parameters of a 3% daily change and an 8% weekly change. The landlord can change these parameters, disable or enable auto-accept, and even enable partial auto-accept. With partial auto-accept, if the recommendation exceeds the auto-accept parameters, the recommendation is accepted as far as the parameter permits. For example, if the auto-accept daily change limit is 4% and the price recommendation is 5%, using partial auto-accept will result in an increase of 4%. By enabling auto-accept, a landlord functionally delegates pricing authority to RealPage (within the bounds of the daily and weekly limits).

100.    As part of the onboarding process, internal RealPage guidance states, "AUTO ACCEPT should be confirmed as 'on' with parameters in place." Internal AIRM training explained that RealPage wanted to "widen auto accept parameters" by introducing the feature

33

and then "creating enough trust so that over time we have client[s] that are willing to let auto accept run with very wide parameters… AKA – accept all recommendations." RealPage trains pricing advisors to have an "accountability conversation" or a "refresher on short term vs long term goals" for clients that show less tolerance for increasing auto-accept parameters.

101.    Even if a landlord does not want to use auto-accept, RealPage trains its advisors to convince the landlord to turn it on with 0% limits—a setting whereby auto-accept will never accept price changes. The reason? So that it is no longer a question of whether the client turns on auto-accept, but only a matter of convincing them to widen the parameters and further delegate pricing decisions. RealPage instructs its advisors on best practices: "[I]f a partner is not ready to use auto acceptance, are they ready to use revenue management?"

### 11. RealPage Pricing Advisors Provide a "Check and Balance" on Property Managers to Increase Acceptance of Recommendations

102.    RealPage offers landlords pricing advisory services. Landlords typically have an assigned pricing advisor, unless the client has internal revenue managers that were certified by RealPage. Pricing advisors play an important role in the daily review of pricing recommendations. Landlords' property managers are asked to review recommendations every morning by 9:30 a.m. After their review, a pricing advisor accepts agreed-upon pricing within an hour and escalates any disputes to the landlord's regional manager.

103.    If a property manager disagrees with the direction of a recommended price change—*e.g.*, the manager wants to implement a price decrease when the model recommends a price increase—the RealPage pricing advisor escalates the dispute to the manager's superior.

34

104.    Beyond the daily interactions between pricing advisors and their own property managers, clients agree to make meaningful changes when they use RealPage's pricing advisory services. Under the specifications for this service, clients agree to use AIRM or YieldStar exclusively to give quotes to potential renters, further tying landlords' pricing decisions to RealPage's software. Clients also agree to change their commission programs for leasing agents to "ensure these programs motivate sales behavior that is consistent with the objectives of revenue growth." And clients further agree to revenue growth as the official metric to evaluate AIRM and YieldStar, as opposed to occupancy rates.

105.    RealPage imposes additional requirements on landlords who want to use internal or in-house revenue management advisors with YieldStar or AIRM (rather than use RealPage pricing advisors). RealPage requires these landlords' employees go through RealPage certification. Certification is a multiday course in which landlords are trained—at times in the same session—on AIRM and YieldStar use and best practices, according to RealPage. Certification includes observing and leading pricing calls with property managers and passing a written exam. This certification program facilitates the landlords' agreements with RealPage to align pricing by ensuring that landlords' internal revenue managers are trained and tested to use AIRM and YieldStar in the same way.

**C. RealPage Harms the Competitive Process and Renters by Entering into Unlawful Agreements with Landlords to Share and Exploit Competitively Sensitive Data.**

106.    AIRM's and YieldStar's use of nonpublic, competitively sensitive data is likely to harm, and has harmed, the competitive process and renters. AIRM and YieldStar distort the competitive process by using nonpublic data to maximize pricing increases and minimize pricing

decreases. AIRM and YieldStar incorporate special rules, called "guardrails," that override the ordinary functioning of the algorithms in ways that tend to push rival landlords' rental prices higher than would occur in a competitive market. RealPage presses landlords to curtail "concessions" to renters. And AIRM and YieldStar's "lease expiration management" features aim to sequence vacancies to maximize landlords' pricing power.

### 1. AIRM and YieldStar Have the Purpose and Effect of Distorting the Competitive Pricing of Apartments

107.    As RealPage frequently trumpets to landlords, "a rising tide raises all ships." AIRM and YieldStar ensure that the "tide" flows primarily one way—higher rental prices. In a hot market, AIRM and YieldStar will recommend price increases to test what the market will bear, while in a down market AIRM and YieldStar will, to the extent possible, still increase or hold prices and minimize price decreases to reach the target occupancy rate.

108.    AIRM and YieldStar are designed to help landlords press pricing beyond what they could otherwise achieve while reducing the risk that other landlords would undercut them. A revenue manager at Willow Bridge explained it succinctly: YieldStar is "designed to always test the top of the market whenever it feels it's safe to." By using competitors' sensitive nonpublic data to generate elasticity estimates, among other things, AIRM and YieldStar can recommend higher price increases to extract more money from renters without losing an additional lease. As RealPage explained to a YieldStar client in training, this pricing elasticity measurement informs "how far do we stretch and pull pricing within the market." That, in turn, means that "we may have a $50 increase instead of a $10 increase for that day."

109.    That insight, gleaned from competitors sharing sensitive, transactional data with RealPage, which is in turn shared with landlords through pricing recommendations, removes uncertainty and competitive pressure that benefits renters. As one landlord put it, these products "eliminate the guessing game" on rent.

110.    As RealPage explains to its clients, AIRM and YieldStar reveal "hidden yield." This extra yield or revenue is hidden in a competitive market—a market in which competitors do not share sensitive information with each other—because landlords "can't see the opportunity" and "fail to capture [the] full opportunity."

111.    AIRM and YieldStar disrupt the normal competitive bargaining process between landlords and renters. They place landlords in a better negotiating position vis-à-vis renters. Landlords using AIRM and YieldStar know that these models recommend floor plan prices and price units incorporating nonpublic data of their competitors, including effective rents and occupancy rates, all of which allow landlords to raise price with more certainty.

112.    As landlords appreciate, AIRM and YieldStar use competitors' nonpublic data to predict with more certainty the highest price that the market will bear for a particular unit. A landlord is therefore less likely to negotiate on price. Any potential negotiation instead turns on lease term and move-in date, for which AIRM and YieldStar adjust the pricing to avoid overexposure for the landlord in the future.

113.    AIRM and YieldStar also encourage landlords to follow each other in raising rents. When transactional data reveal that peers are raising effective rents—particularly the highest and lowest competitors for a given floor plan—AIRM and YieldStar follow with recommendations to increase rental prices. This movement with the market is ingrained in the

AIRM and YieldStar models; AIRM and YieldStar will not recommend a floor plan price that falls below the market minimum.

114.    Accordingly, as adoption of AIRM and YieldStar increases among peer competitors, the use of AIRM and YieldStar can push prices up through a feedback effect. As peers move up, other AIRM or YieldStar users may move up accordingly.

115.    AIRM uses machine learning to train models on competing landlords' sensitive data. The parameters learned in this training are then applied to each AIRM client. As a result, the model uses the same method and learned parameters to generate price recommendations from the relevant data for each landlord.

116.    This aligns and stabilizes prices in at least two ways. First, it reduces volatility in *how* prices change, compared to a situation in which each client sets prices independently. No longer do competitors react in distinctive ways to changing market conditions as they would in a market without access to competitors' transactional data. Instead, AIRM price recommendations tend to standardize those reactions. This leads to the second result: pricing recommendations, and consequently pricing decisions, become more predictable and aligned among competitors as each is using the same set of learned model parameters.

117.    This dynamic exists not only in markets with growing demand, but also so-called "down markets," where demand is decreasing. In a competitive market with a fixed supply (at least in the short run) of housing units, a demand decrease would result in prices falling. But AIRM and YieldStar resist price decreases in down markets as much as possible while achieving targeted occupancy rates. RealPage told one prospective AIRM client that the combination of

"AI and the robust data in the RealPage ecosystem" would allow the landlord to "avoid the race to the bottom in down markets."

### 2. AIRM and YieldStar Impose Multiple Guardrails Intended to Artificially Keep Prices High or Minimize Price Decreases

118. Unsatisfied with relying merely on competitively sensitive data to advantage landlords, RealPage created "guardrails" within AIRM and YieldStar to force adjustments to the price recommendation. But these guardrails serve as one-way ratchets that help landlords, not renters, by increasing price recommendations or limiting a recommended decrease. And each of these guardrails makes use of competitively sensitive data that landlords agree to share with RealPage. These guardrails have even spurred multiple landlords to tell RealPage that AIRM and YieldStar are not dropping recommended rents as much as their individual conditions, or even market conditions, would warrant.

119. **Hard Floor.** AIRM and YieldStar will not recommend a floor plan price that falls below the smoothed market minimum effective rent. The market minimum is a hard floor. AIRM and YieldStar thus explicitly constrain floor plan price recommendations based on the prices of competitors, using shared nonpublic information.

120. **Revenue Protection Mode.** RealPage created a "revenue protection" mode that effectively lowers output to increase revenues. Revenue protection activates when AIRM or YieldStar predict—using calculations incorporating competitors' data—that demand is too low for a landlord to meet its target occupancy. Rather than lowering the price to stimulate demand, the algorithm reduces the target number of leases. AIRM and YieldStar then maximizes revenue for the reduced occupancy level, which tends to reduce price decreases or increase rental prices.

121.    RealPage acknowledges that revenue protection "may seem counterintuitive to leasing needs." In June 2023, a landlord complained to RealPage that "something in your model is broken" because "the pricing model is not lowering rents dramatically" despite the client's high exposure during a busy summer leasing season. RealPage explained that, with revenue protection, "the model still sees the way to make more revenue is to lease fewer units at higher prices." In other words, the model seeks to "raise rates to get the highest dollar value possible for the leases we can statistically achieve" and ignore those leases that the client wants but the model predicts, using competitors' data, the client will not get.

122.    Revenue protection mode interrupts AIRM's and YieldStar's normal revenue maximization process. As a RealPage data scientist explained, "the model really wants to reduce rent but is prevented from doing so by the revenue protection restriction." Revenue protection leads to higher prices and lower occupancy.

123.    ***Sold-Out Mode.*** Once a landlord reaches its targeted capacity for a particular floor plan, the model considers that floor plan "sold out" even though units may still be physically available. In that situation, AIRM and YieldStar recommends the maximum rent charged by a property's competitors, even if the floor plan's previous price was far lower.

124.    RealPage intentionally designed sold-out mode to use competitively sensitive data to lift rents. In an earlier version of the software, sold-out mode pushed rents to 95% of that floor plan's highest recently achieved rent. But RealPage modified the algorithm in 2022 to go "straight to 100% of comps," deliberately aligning rents with competitors' highest rents, rather than the property's own historical performance.

125.   ***The Governor.*** AIRM and YieldStar favor recommended price increases over price decreases. When the model calculates that the current day's "optimal" price will result in greater revenue than the previous day, a feature called the "governor" causes the model to recommend the current day's optimal price. But when AIRM or YieldStar calculates that the current day's optimal price will result in less revenue than the previous day, the governor recommends the recent average price *even though it is not optimal for the current day*. In other words, when market conditions weaken and the model calculates that a price decrease is warranted, this guardrail kicks in and recommends keeping the recent rent even though it is suboptimal. This asymmetry favors price increases over price decreases.

126.   The effect of these guardrails is intentionally asymmetric. AIRM and YieldStar recommend price increases generated by the model. But the guardrails reduce or eliminate certain proposed price decreases even though the model has determined such deviations may contravene the landlord's individual economic interest.

### 3.   AIRM and YieldStar Harm the Competitive Process by Discouraging the Use of Discounts and Price Negotiations

127.   RealPage discourages landlords using AIRM and YieldStar from discounting rents. In the multifamily property industry, discounts typically consist of "concessions," which are financial allowances (such as a free month's rent or waived fees) offered to incentivize renters. Concessions may be offered generally or negotiated individually with a potential tenant.

128.   In a competitive marketplace, each landlord may independently decide to offer concessions so that it can better compete in enticing lessors. But, again, RealPage seeks to replace fully independent, competitive decision-making with collective action by ending

concessions. AIRM and YieldStar do not work as well when landlords use one-off concessions. In its "best practices" for revenue management to landlords, RealPage's guidance is simple: "Eliminate concessions." Detailed "best practices" documents for both YieldStar and AIRM users explain that "concessions will no longer be used in conjunction with" YieldStar and AIRM.

129.    When onboarding a new property, RealPage emphasizes the importance of accepting price recommendations without offering discounts, including "no concessions." Concessions cause landlords to deviate from what RealPage determines is the maximum revenue-generating price.

### 4. AIRM and YieldStar Increase and Maintain Landlords' Pricing Power by Using Competitors' Data to Manage Lease Expirations

130.    Supply is a basic component of pricing. For this reason, information on a company's supply is highly sensitive, and its disclosure to competitors is particularly concerning. Yet AIRM and YieldStar use competitors' supply data precisely for the purpose of adjusting unit-level pricing, regardless of whether the landlord accepts the floor plan price recommendation. The goal of this "lease expiration management" is clear: As a RealPage senior manager explained for a client, using this data means that the client's property "will remain in a position of pricing power."

131.    The purpose of lease expiration management is to avoid too many units becoming available in the market at the same time. Expiration management only increases unit-level prices. It never reduces the price.

132.    Every landlord can choose to use "market seasonality" to inform its lease expiration management. As the name suggests, market seasonality adjusts the landlord's prices

42

based on how many of its competitors' units will be vacant—that is, *future supply*. This feature is popular among landlords. For example, one of the largest landlords in the United States uses it in 98% of its properties. Every single property that uses market seasonality is leveraging RealPage's access to this highly sensitive, nonpublic data about its competitors' supply to inform pricing. RealPage trains landlords to turn on market seasonality as a best practice.

133.    When activated, the market seasonality function changes unit-level prices across the different possible lease terms *regardless* of whether the landlord accepts the AIRM or YieldStar floor plan price recommendation.

134.    RealPage determines for landlords an important input into lease expiration management: the expirations threshold. This threshold influences the point at which expiration premiums are added. The threshold calculation relies on nonpublic lease transaction data for the property's submarket and pulls from numerous RealPage products, including YieldStar, AIRM, OneSite, Business Intelligence, and Performance Analytics with Benchmarking. Landlords cannot adjust the expirations threshold.

135.    Fueled by competitor data, expiration management results in "increased stability" and "pricing power." Using competitors' data reduces the risk of overexposure that "could erode rent roll growth." By adjusting price recommendations based on how much total supply is forecast in the market for a given time period, AIRM empowers landlords to charge higher prices than they could without access to competitors' nonpublic data.

### 5. *No Procompetitive Benefit Justifies, Much Less Outweighs, RealPage's Use of Competitively Sensitive Data to Align Competing Landlords*

136.    AIRM and YieldStar do not benefit the competitive process or renters. Any legitimate benefits of revenue management software can be achieved through less anticompetitive means, and any theoretical additional benefits of AIRM and YieldStar are not cognizable and outweighed by harm to the competitive process and to renters.

## V.    RELEVANT ANTITRUST MARKET

137.    Conventional multifamily rental housing is a relevant product market. Conventional multifamily rental housing includes apartments available to the general public in properties that have five or more living units. Conventional rental housing does not include student housing, affordable housing, age-restricted or senior housing, or military housing. This product market reflects consumer preferences, industry practice, and governmental policy.

138.    According to the 2023 ACS, approximately 340,000 Kentuckians live in multifamily rental housing.

## A. Conventional Multifamily Rentals are Distinct from Other Types of Multifamily Housing

139.    Other types of multifamily apartment buildings are not good substitutes for conventional multifamily rentals. Some kinds of multifamily buildings are restricted to specific types of renters, such as student housing units, affordable housing units (i.e., income-restricted housing), senior (i.e., age-restricted) housing, and military housing. These housing units focused on different classes of renters are not reasonable substitutes for conventional multifamily rentals.

RealPage distinguishes conventional multifamily as being in a different market segment from senior, affordable, and student housing in the ordinary course of business.

140.    Non-conventional units are not widely available to all renters and can exhibit different buying patterns. For example, student housing serves individuals enrolled in higher education and is typically located on or near universities. Student housing is typically leased by the bed instead of by unit and faces a significantly different leasing cycle and different patterns in renewals and leasing practices. Recognizing these differences, RealPage will assign to student properties surrogates that are distant student assets rather than nearby conventional assets. RealPage in fact offers a different version of both AIRM and OneSite, its property management software, for the "student market."

141.    Affordable housing units are available only to individuals or households whose income falls below certain thresholds. Multiple federal affordable housing regulations, for example, require participants in affordable housing programs to have incomes lower than a set percentage, such as 30%, of the median family income in the local area. Affordable housing units are also relatively scarce, with families seeking such housing often waiting years on a waitlist. These legal and practical restrictions prevent affordable housing from being a reasonable substitute to conventional multifamily housing for the typical renter.

142.    Senior housing is typically restricted to individuals aged 55 and older. RealPage separates senior housing into four categories: independent living, assisted living, memory care, and nursing care. Independent living offers senior-focused amenities—such as transportation, meals, and social gatherings among community members—that materially increase housing costs and are less desirable to younger households. The other three categories of senior housing

45

provide professional or special care to assist renters with basic tasks like eating, bathing, and dressing, and they are not reasonable substitutes for conventional multifamily rentals.

143.    Military housing is also not a reasonable substitute for conventional multifamily rentals. It is typically geographically proximate to military installations, with roughly 95% of military housing found on-base. Although civilians may in some cases be able to live in military housing properties experiencing low occupancy rates, military regulations place them below five higher-priority categories of potential renters, including active and retired military personnel.

**B. Single-Family Housing Is Not a Reasonable Substitute for Multifamily Rentals**

144.    The multifamily industry, government regulators, and policy documents distinguish between properties with at least five units, which are classified as "multifamily housing" and those with fewer units, which are classified as "single-family rentals."

145.    The purchase of single-family or other types of homes is not a reasonable substitute for conventional multifamily housing rentals. A former RealPage economist explained that "the choice between renting and owning is first and foremost a life stage and lifestyle choice over a financial one." Single-family homes also generally require a substantial down payment. In March 2023, a RealPage economist estimated an "entry premium" of $800 per month to home ownership over rentals. According to a 2021 RealPage strategic planning guide, the "myth" that people were abandoning multifamily properties for single-family homes is false, stating that "rising home sales do not hurt apartment demand." Single-family home sales are not reasonable substitutes for conventional multifamily housing.

146.    More broadly, renters living in conventional multifamily apartments will not switch to single-family homes—purchases or rentals—because of a small increase in rent. The

decision to move from an apartment building to a single-family home is primarily a life-stage and lifestyle choice. For example, the decision by a household to have children may spur a move to a single-family home. In many areas, relatively few children live in conventional multifamily apartments. Multifamily apartments typically offer community amenities and a different lifestyle, such as high walkability in an urban area, whereas single-family homes generally do not offer the same amenities and offer instead increased privacy, including private yards. A RealPage analyst explained in 2022 that because a move to a single-family home is a "lifestyle choice," single-family home rentals were not direct competitors to multifamily rental housing.

147.    Industry participants agree that single-family rentals attract a different pool of renters from multifamily rentals. A managing director of a single-family rental property management company explained in 2021 that a renter's journey from multifamily apartment living to single-family rentals came as life stages evolved. The CEO of a single-family rental developer similarly explained that these single-family rental homes are for renters who age out of multifamily apartments. Single-family rentals are also typically priced higher than multifamily apartments, further reducing potential substitution between them.

### C. Geographic Markets

148.    Defining relevant geographic markets helps courts assess the potential anticompetitive impact of the agreements challenged. Here, the relevant geographic markets for the purposes of analyzing the anticompetitive effects of RealPage's agreements with landlords are the areas in which the sellers (the landlords) sell and in which the purchasers (potential renters) can practicably turn for alternatives. RealPage's agreements are alleged to have suppressed price competition in the markets for conventional multifamily housing. The relevant

geographic markets to assess those agreements are those property locations close enough for their apartments to be considered reasonable substitutes. In delineating a geographic market for conventional multifamily housing, the focus is inherently local. Renters are typically tied to a particular location for work, family, or other needs.

149.    In Kentucky there are numerous geographic submarkets, including, but not limited to, the Greater Cincinnati, Louisville, and Lexington-Fayette markets.

## VI.   CAUSES OF ACTION

### COUNT I
### Price Fixing in Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)

150.    The Commonwealth reasserts, realleges, and incorporates by reference each of Paragraphs 1-149, above, as though fully set forth herein.

151.    During the Conspiracy Period (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

152.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the price of multifamily rental housing in Kentucky and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

153.    Defendant Landlords have agreed with RealPage to delegate rent price-setting responsibility to RealPage for multifamily housing units in the Commonwealth, rather than competing with other landlords on the basis of price.

154.    Defendants' anticompetitive conduct had the following effects, among others:

    a.    Competition among Defendants has been restrained or eliminated with respect to multifamily rental housing;

    b.    The prices of multifamily housing rents have been fixed, stabilized, or maintained at artificially high levels; and

    c.    Renters in Kentucky have been deprived of the benefits of free and open competition between and among Defendants.

155.    This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

156.    Kentucky, as *parens patriae*, is entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

**COUNT II**
**Information Exchange in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**

157.    The Commonwealth reasserts, realleges, and incorporates by reference each of Paragraphs 1-149, above, as though fully set forth herein.

49

158.    During the Conspiracy Period (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered into and engaged in a contract, combination, or conspiracy to unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

159.    The contract, combination, or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

160.    This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful *per se*. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

161.    Kentucky, as *parens patriae*, is entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## COUNT III
### Violations of the Kentucky Consumer Protection Act
### KRS § 367.175

162.    The Commonwealth reasserts, realleges, and incorporates by reference each of Paragraphs 1-149, above, as though fully set forth herein.

163.    KRS § 367.175(1) states that "[e]very contract, combination in the form of trust and otherwise, or conspiracy, in restraint of trade or commerce in this Commonwealth shall be unlawful."

164.    By entering into an agreement providing for the use of RealPage's RMS software and related services, as well as the exchange of sensitive non-public information with competitors through RealPage, Defendants have entered into contracts, combinations in the form of a trust or otherwise, or conspiracies in restraint of trade or commerce, all or any part of which is within the Commonwealth, in violation of KRS § 367.175. Defendant Landlords have agreed with RealPage to delegate rent price-setting responsibility to RealPage for multifamily housing units in the Commonwealth, rather than competing with other landlords on the basis of price.

165.    Defendants' anticompetitive misconduct is unlawful *per se* under the Kentucky Consumer Protection Act. Even if the misconduct was not found to be unlawful *per se,* the misconduct is additionally unlawful under the rule of reason. There are no procompetitive justifications sufficient to outweigh the anticompetitive effects of the misconduct.

166.    The result of Defendants' anticompetitive conspiracy has been to limit competition in the market for leases of multifamily housing units in the Commonwealth, forcing Kentucky renters to pay illegal, supra-competitive rents and incur substantial damages.

167.    Pursuant to KRS § 367.190, the Commonwealth is entitled to injunctive relief against RealPage to enjoin and restrain RealPage from promulgating pricing recommendations in Kentucky that are the result of collusion amongst competitors.

168.    Pursuant to KRS § 367.190, the Commonwealth is entitled to injunctive relief against the Defendant Landlords to enjoin and restrain the Defendant Landlords from promulgating rental prices in Kentucky that are the result of collusion amongst competitors.

169.    Pursuant to KRS § 367.990(8) the Attorney General, upon petition to the court, may recover, on behalf of the Commonwealth, a civil penalty of not more than the greater of five

thousand dollars ($5,000) or two hundred dollars ($200) per day for each and every violation of KRS 367.175.

170.    In addition, the Commonwealth is entitled to all other relief permitted by law, including damages, disgorgement, and/or restitution.

**COUNT IV**
**Violations of the Kentucky Consumer Protection Act**
**KRS § 367.170**

171.    The Commonwealth reasserts, realleges, and incorporates by reference each of Paragraphs 1-149, above, as though fully set forth herein.

172.    KRS § 367.170(1) states that "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

173.    KRS § 367.170(2) states that "unfair shall be construed to mean unconscionable."

174.    Each time that RealPage provided a pricing recommendation within Kentucky, it committed a separate unfair, false, misleading and/or deceptive act in violation of KRS § 367.170 because such a pricing recommendation was the result of collusion amongst competitors and was willfully promulgated with the intent of depriving a renter of the benefits of competition, including bargaining power.

175.    Each time that a Defendant Landlord published, whether in print, online, or otherwise, a rental price based on a RealPage pricing recommendation, that Defendant Landlord committed a separate unfair and unconscionable act in violation of KRS § 367.170 because such a rental price was the result of collusion amongst competitors and was willfully promulgated with the intent of depriving a renter of the benefits of competition, including bargaining power.

176.     Each time that a Defendant Landlord published, whether in print, online, or otherwise, a rental price based on a RealPage pricing recommendation, that Defendant Landlord committed a separate misleading and deceptive act in violation of KRS § 367.170 by willfully omitting the fact that the rental price was set through collusion amongst competitors.

177.     Pursuant to KRS § 367.190, the Commonwealth is entitled to injunctive relief against RealPage to enjoin and restrain RealPage from promulgating pricing recommendations in Kentucky that are the result of collusion amongst competitors.

178.      Pursuant to KRS § 367.190, the Commonwealth is entitled to injunctive relief against the Defendant Landlords to enjoin and restrain the Defendant Landlords from promulgating rental prices in Kentucky that are the result of collusion amongst competitors.

179.     Pursuant to KRS § 367.990(2), the Commonwealth is entitled to civil penalties of up to $2,000 from the Defendants for each and every one of their willful violations of KRS § 367.170. Additionally, the Commonwealth is entitled to civil penalties of up to $10,000 for each violation directed at a person aged sixty (60) years of age or older.

## COUNT V
## UNJUST ENRICHMENT
### (Against the Defendant Landlords)

180.     The Commonwealth reasserts, realleges, and incorporates by reference each of Paragraphs 1-149, above, as though fully set forth herein.

181.     The Commonwealth brings this unjust enrichment claim against the Defendant Landlords pursuant to its *parens patriae* authority to protect its quasi-sovereign interests in the general economy of the state and the economic health and well-being of its residents, as well as

pursuant to the Attorney General's statutory authority to initiate litigation when in the interests of the Commonwealth per KRS § 15.020(3).

182.    As a direct result of the Defendant Landlords' unlawful conduct, renters in Kentucky paid artificially inflated rental prices that exceeded any amount they would have paid if such prices had been determined by a free and competitive market.

183.    In renting housing, as alleged above, the renters conferred a benefit on the Defendant Landlords, who possess knowledge of the benefit.

184.    The Defendant Landlords accepted and retained the conferred benefit.

185.    Under the circumstances, it would be inequitable for the Defendant Landlords to retain the benefit without paying for it.

186.    As a result of their unlawful conduct described herein, the Defendant Landlords have been and will continue to be unjustly enriched by the receipt of monies from rent at unlawfully inflated prices and unlawful profits from the same.

187.    The common-law principle of unjust enrichment prohibits the Defendant Landlords from retaining the benefits conferred on them by the overpayments from renters within Kentucky.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff, the Commonwealth of Kentucky, respectfully requests that the Court enter judgment in its favor and against Defendants, as follows:

a.    Entering an Order finding that the Defendants have violated the Sherman Act, the Kentucky Consumer Protection Act, as well as the common law of Kentucky as set forth herein,

54

and have been unjustly enriched by such, and that judgment be entered against Defendants in favor of Plaintiff;

b.      Granting Plaintiff all recoverable measures of damages—including but not limited to treble damages—allowable under the claims identified herein;

c.      Awarding Plaintiff penalties of up to $2,000.00 per willful violation of the KCPA pursuant to KRS § 367.990(2);

d.      Awarding civil penalties of $10,000 for each violation of the Kentucky Consumer Protection Act pursuant to KRS § 367.990(2), where Defendants' conduct was directed at a person aged sixty (60) years of age or older;

e.      Awarding civil penalties of five thousand dollars ($5,000) or two hundred dollars ($200) per day for each and every violation of KRS § 367.175.

f.      Disgorging Defendants' unjust profits pursuant to KRS § 367.200;

g.      Awarding Plaintiff temporary and permanent injunctive relief against Defendants' ongoing violations of the Sherman Act and against Defendants' ongoing violations of the KCPA, and a penalty of up to $25,000 per violation of that temporary and permanent injunction;

h.      Awarding Plaintiff disgorgement of all of Defendants' ill-gotten gains;

i.      Entering an Order finding that, in accordance with the KCPA, Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from, in any manner, continuing, maintaining or renewing the conduct, alleged herein in violation of the above stated Kentucky laws, or from entering into any other contract, conspiracy having a similar purpose or effect;

55

g.    Allowing Plaintiff to recover the costs and expenses of suit, pre- and post-judgment interest, and reasonable attorneys' fees as provided by law;

k.    Awarding the Commonwealth its costs and attorneys' fees;

l.    Awarding the Commonwealth prejudgment interest as permitted by law;

k.    Ordering such other and further relief as the Court deems just, necessary, and appropriate.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.


DATED: July 2, 2025                    Respectfully submitted

                                       By:  /s/ John M. Ghaelian

                                       RUSSELL COLEMAN
                                       Kentucky Attorney General
                                       Chris Lewis (KY Bar #87109)
                                       Division Chief, Consumer Protection
                                       Philip R. Heleringer (KY Bar #96748)
                                       Executive Director, Consumer Protection
                                       John M. Ghaelian (Ky Bar #94987)
                                       Assistant Attorney General
                                       Office of the Kentucky Attorney General
                                       Office of Consumer Protection
                                       1024 Capital Center Drive, Suite 200
                                       Frankfort, Ky 40601
                                       (502) 696-5605(Lewis)
                                       (502) 696-5647 (Heleringer)
                                       (502) 696-5314 (Ghaelian)
                                       christian.lewis@ky.gov
                                       philip.heleringer@ky.gov
                                       john.ghaelian@ky.gov

Adam J. Levitt (*pro hac vice* forthcoming)
Daniel R. Ferri (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
(312) 214-7900
alevitt@dicellolevitt.com
dferri@dicellolevitt.com

Gregory S. Asciolla (*pro hac vice* forthcoming)
Carrie Syme (*pro hac vice* forthcoming)
Jonathan S. Crevier (*pro hac vice* forthcoming)
Noah L. Cozad (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
csyme@dicellolevitt.com
jcrevier@dicellolevitt.com
ncozad@dicellolevitt.com

Anna Claire Skinner (KY Bar #97544)
**DICELLO LEVITT LLP**
110 West Vine Street, Suite 409
Lexington, Kentucky 40507
askinner@dicellolevitt.com

57